**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JERRY JOHNSON, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-CV-1710-SPM |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of

Plaintiff Jerry Johnson, Sr. for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401 *et seq.* (the "Act").  The parties have consented to the jurisdiction of the

undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 18).  For the

reasons stated below, the Court reverses the Commissioner's denial of Plaintiff's application and

remands this case for further proceedings.

## I.      PROCEDURAL HISTORY

On September 23, 2009, Plaintiff Jerry Johnson, Sr. filed an application for Social

Security Benefits under Title II.  (Tr. 101).  Plaintiff alleged disability due to lower back

degeneration and hypertension.  (Tr. 128).  The Social Security Administration denied his claim

on December 11, 2009.  (Tr. 49).  On January 21, 2010, Plaintiff filed a Request for Hearing, and

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.

a hearing was held before an Administrative Law Judge (ALJ) on November 10, 2010.  (Tr. 57, 23-45).  On December 16, 2010, the ALJ issued a decision finding Plaintiff not disabled, so Plaintiff filed a Request for Review of Hearing Decision on February 9, 2011.  (Tr. 9-22, 7).  The Appeals Council denied his Request for Review on August 2, 2011.  (Tr. 1-6).  Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II.    FACTUAL BACKGROUND

### A. BACKGROUND

Plaintiff appeared in front of the ALJ at a hearing on November 10, 2010.  (Tr. 23-41). At the time of the hearing, Plaintiff was 60 years old.  (Tr. 27).  Plaintiff lives with his wife and a grandson.  (Tr. 37).  Plaintiff has a high school diploma and completed three years of college, where he studied business administration.  (Tr. 29).

Plaintiff worked most recently as a substitute teacher from 2000 to 2009.  (Tr. 29-30). He testified that he worked, on average, 16 days a month.  (Tr. 30).  Plaintiff alleged that he became unable to work as a substitute teacher on May 21, 2009, because of back pain and because his medication caused him to be unable to think clearly and sharply.  (Tr. 30).  He also indicated that he cannot sit, stand, or walk for extended periods of time; that he is in severe pain; that he has to lie down about every two hours; that he has concentration and memory problems; and that he has fatigue.  (Tr. 128).  Prior to working as a substitute teacher, he worked for approximately 26 years as a structural iron worker, erecting buildings and putting reinforcement steel in concrete.  (Tr. 30-31, 136-37).  As an iron worker, he had to lift at least 60 or 70 pounds and climb and balance on beams.  (Tr. 40).  He became unable to do iron work in 1999 or 2000. (Tr. 30, 128).  He tried briefly to work as an iron worker in 2006 but found that he was physically unable to do the lifting and bending required because of his back.  (Tr. 31-32).

Plaintiff stated that pain in his back hurts 24 hours a day.  (Tr. 32).  Plaintiff testified that although he can stand for 15 to 30 minutes, his back pain would get really bad if he did so, and he would have to sit down.  In addition, if he sits down for an extended period of time, the pain gets bad, and he has to lie flat and stretch out his legs.  Plaintiff testified that he can walk 75 yards before taking a break; that he can lift a gallon of milk; that he can crouch, stoop, or bend slowly if he concentrates; and that he can climb stairs slowly.  (Tr. 34).  Plaintiff has been using a cane for about a year and a half, but it was not prescribed by a physician.  (Tr. 37, 39).  Additionally, since about March 2010, Plaintiff has had shoulder pain and trouble reaching over his head with his left arm.  (Tr. 35, 40).

Plaintiff sees an orthopedic surgeon in addition to his primary care physician.  (Tr. 32).  His doctors have prescribed naproxen[2] for his pain, which he takes three times a day, as well as Advil. [3]  (Tr. 32-33).  He also takes Lisinopril for his blood pressure, Lipitor for his cholesterol, and an antidepressant.  (Tr. 33).  Plaintiff also does some exercises to try to relieve the pain.  (Tr. 40).  Plaintiff's orthopedic surgeon believes that surgery is the only way to relieve his back pain; however, Plaintiff is reluctant to do so because of a recent negative experience with surgery unrelated to his back.  (Tr. 33-34).

Plaintiff testified that his medications help but do not resolve his issues, and they clog up his mind and make him listless.  (Tr. 33).  Plaintiff also has low energy levels, which he attributes to the medication.  (Tr. 39).  Plaintiff testified that his medications give him a feeling of "being drugged": he cannot think clearly and his memory is not what it used to be.  He has

---

[2] Naproxen is used to relieve pain, tenderness, swelling, and stiffness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

[3] Advil is used to relieve pain, tenderness, swelling, and stiffness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html.

trouble focusing and concentrating and cannot watch a whole television program.  (Tr. 36).  He reads but has to read something a few times in order for it to "soak in."  (Tr. 37).

In a typical day, Plaintiff watches television and lies down frequently to relieve his back pain.  (Tr. 37).  He lies down at least half the day.  (Tr. 38).  He also washes dishes, sweeps, cooks, and helps with grocery shopping.  (Tr. 37-38).  He does not do laundry because it is hard to carry it down the stairs.  (Tr. 38).  Plaintiff stated that he has no trouble dealing with people. (Tr. 37).

### B.  MEDICAL TREATMENT

Records predating Plaintiff's disability onset date of May 29, 2009, show that Plaintiff had hypertension and hyperlipidemia in 2008 and had a more distant history of degenerative disc disease.  (Tr. 190, 191, 193, 195, 197, 198, 200).

On October 13, 2009, Plaintiff went to see Kenneth Wilkins, M.D., complaining of hypertension and low back pain.  The records also noted prior evaluations for gallstones and an adrenal gland mass, as well as a history of degenerative disc disease of the lumbosacral spine. Under "Social History," Plaintiff's functional status was noted to be "No Physical disability." (Tr. 186).   Examination revealed lumbosacral spine abnormalities and spasms in Plaintiff's paraspinal muscles, but no weakness, tenderness, or decreased sensation.  Plaintiff had a normal gait, normal knee jerk, and normal reflexes, and he could stand on his toes and heels.   Dr. Wilkins assessed Plaintiff with hypertension and backache and ordered a lumbosacral spine X-ray.  (Tr. 188).   He prescribed Lisinopril-Hydrochlorothiazide, Lipitor, and Tramadol.[4]  (Tr. 189).  Additionally, Dr. Wilkins counseled Plaintiff regarding diet and exercise.  (Tr. 188).

---

[4] Tramadol is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html.

On October 27, 2009, Plaintiff returned to Dr. Wilkins for a review of laboratory tests. Plaintiff "denie[d] complaints," his pain level was zero, and the review of systems revealed no localized joint pain or stiffness. (Tr. 183-84). Dr. Wilkins diagnosed hyperlipidemia, arthralgia, and elevated liver function. Plaintiff's medication regimen was unchanged, and Plaintiff's functional status was again noted as "No Physical disability." (Tr. 183). Dr. Wilkins diagnosed Plaintiff with hyperlipidemia, arthralgia, and elevated liver function tests. (Tr. 184). The "Plan" states, 'L-spine X-ray c/w degenerative OA of facet joints between L3, L4, L5"; "probable old rupture with advanced degeneration of discs between L4, L5, S1" "ORTHOPEDICS eval ordered SLCC." (Tr. 185).

On October 29, 2009, Plaintiff visited Dr. Ira Kodner at St. Louis Connect Care (SLCC) for his adrenal gland mass. (Tr. 209). Dr. Kodner noted an adrenal gland mass found on a CT scan. (Tr. 210). Additionally, on November 19, 2009, after reviewing test results, Dr. Kodner assessed that Plaintiff suffered from multiple gallbladder stones. (Tr. 314). On December 9, 2009, Plaintiff visited Dr. Kodner and scheduled a laparoscopic left adrenalectomy[5] and laparoscopic cholecystectomy[6]. (Tr. 313).

On December 9, 2009, Plaintiff returned to Dr. Wilkins and reported chronic lower back pain with no radicular pain, no pain down the back of the lower extremities, and no sleep disturbance. (Tr. 249). The review of symptoms showed muscle aches and joint pain and stiffness, and examination showed lumbosacral spine abnormalities and spasms, but straight-leg raising tests were negative. (Tr. 251). Plaintiff's functional status was again noted to be "No

---

[5] Adrenalectomy is the removal or one or both suprarenal glands. *Stedman's Medical Dictionary* 31 (28th ed.).

[6] Cholecystectomy is surgical removal of the gallbladder. *Stedman's* 365.

Physical disability."   (Tr. 250).   Dr. Wilkins assessed backache, hypertension, and hyperlipidemia and prescribed naproxen, Prilosec,[7] and Lipitor.  (Tr. 251-52).

On January 6, 2010, Plaintiff underwent an adrenalectomy and cholecystectomy at Barnes Jewish Hospital.  (Tr. 341-45).  On January 10, 2010, Barnes Jewish discharged Plaintiff from the hospital, and he was instructed "to avoid lifting greater than 10 pounds for two weeks." (Tr. 330-31).

On February 23, 2010, Plaintiff returned to Dr. Wilkins for back pain and depression and for follow-up regarding his hypertension and hyperlipidemia.  Plaintiff reported chronic lower back pain with no radicular pain and no pain down the back of the lower extremities.  (Tr. 245). The review of symptoms showed muscle aches and joint pain and stiffness, and examination showed lumbosacral spine abnormalities and spasms, but straight-leg raising tests were negative. (Tr. 246-47).   Plaintiff also reported fatigue, decreased ability to concentrate, feelings of hopelessness/worthlessness, and hypersomnia.   (Tr. 245).   However, mental status findings showed a euthymic mood, a normal affect, and no recurrent suicidal ideation.  (Tr. 247).  The review of Plaintiff's functional status was again noted to be "No Physical disability."  (Tr. 246). Dr. Wilkins assessed hypertension, hyperlipidemia, backache, and depression.  (Tr. 247).  He continued Plaintiff's prior medication and added a prescription for Paxil[8]; he also recommended a consultation with a psychiatrist and mental health counselor.  Dr. Wilkins prescribed Lipitor, Paxil, and planned for a consultation with a psychiatrist and mental health counselor.  (Tr. 248).

On April 15, 2010, after several visits for complications from the adrenalectomy and cholecystectomy surgeries, Plaintiff followed up with Dr. Anne Yi-Jiun at SLCC.  (Tr. 301).

---

[7] Prilosec is used alone or with other medications to treat gastroesophageal reflux disease (GERD).  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html.

[8] Paxil is used to treat depression, panic disorders, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html.

Plaintiff complained of post operative incisional tenderness, chest pain, goiter,[9] hematoma, and level seven side pain.  Dr. Lin assessed Plaintiff with hiatal hernia, hematoma, chest pain, possible incisional hernia,[10] and goiter.  (Tr. 300).  Plaintiff told Dr. Lin that he did not wish to proceed with surgery for the hiatal hernia.  Dr. Lin planned to monitor the hematoma and hernia, refer Plaintiff for an endoscopy, wait for goiter until Plaintiff sees endocrinologist, and refer Plaintiff to cardiologist for stress testing.  (Tr. 301).

On June 14, 2010, Plaintiff visited Dr. David Kieffer at SLCC, complaining of lower back pain, which he rated at a "10."  Dr. Kieffer noted lumbosacral spine abnormalities, abnormal lumbosacral motion, pain in the lumbosacral spine with motion, and a positive straight-leg raising test on the left.  Dr. Kieffer assessed Plaintiff with lumbago,[11] intervertebral disc degeneration, and herniated intervertebral disc.  He ordered an MRI and a workup for lumbosacral infusion.  (Tr. 291).  A radiology report from the same day showed mild degenerative changes of the lumbar spine with evidence of degenerative disc disease at L5-S1.  (Tr. 319).

On July 1, 2010, Plaintiff returned to Dr. Wilkins for lower back pain, depression, hyperlipidemia, and follow-up regarding hypertension.  Plaintiff reported chronic lower back pain with no radicular pain and no pain down the backs of the lower extremities.  (Tr. 241).  He indicated that his pain was at a "9/10" level.  (Tr. 242).  The review of symptoms showed muscle aches and joint pain and stiffness, and examination showed lumbosacral spine abnormalities and spasms, but straight-leg raising tests were negative.  (Tr. 242-43).  Plaintiff also reported fatigue, decreased ability to concentrate, feelings of hopelessness and worthlessness, and hypersomnia.

---

[9] Goiter is a chronic enlargement of the thyroid gland.  *Stedman's* 824.

[10] Hernia is the protrusion of a part or structure through the tissues normally containing it. *Stedman's* 879.

[11] Lumbago refers to pain in the lower back.  *Stedman's* 1121.

(Tr. 241).  However, again mental status findings showed a euthymic mood, a normal affect, and no recurrent suicidal ideation.  (Tr. 243).  Plaintiff's functional status was again noted as "No Physical disability."  (Tr. 242).  Dr. Wilkins assessed depression, backache, hypertension, and hyperlipidemia; ordered an orthopedics evaluation; and continued Plaintiff's Lipitor and Paxil prescriptions.  (Tr. 244).

On July 12, 2010, Plaintiff received an MRI at St. Louis University Hospital.  The MRI revealed posterior diffuse disc bulge at L3-L4, L4-L5, and L5-S1, without evidence of central canal stenosis.  The results were "consistent with moderate degenerative changes," and the impression was multilevel lumbar spondylosis.  (Tr. 233).

On July 27, 2010, a CT scan showed "minimal degenerative changes of the intervertebral disc of L4 and L5 vertebrae," multiple cysts in the liver, calcified granulomas in the spleen, and a hypoattenuating mass from the left adrenal gland.  (Tr. 317).

On August 5, 2010, Plaintiff saw Dr. Ira Kodner to follow up on his CT scan, and he complained of left shoulder pain.  Dr. Kodner assessed Plaintiff with left shoulder osteoarthritis and referred Plaintiff to an orthopedist for shoulder evaluation.  (Tr. 281).

On September 8, 2010, Plaintiff visited Dr. David Kieffer at SLCC for low back pain and shoulder pain.  The review of musculoskeletal systems revealed abnormal shoulder motion, pain elicited by shoulder motion, and shoulder weakness.  Dr. Kieffer assessed Plaintiff with shoulder impingement, complete tear of the rotator cuff tendon, shoulder tendonitis, and subacromial bursitis and recommended weight loss and prescribed exercises.  (Tr. 279).

On September 30, 2010, Plaintiff visited Dr. Wilkins for lower back pain, depression, hyperlipidemia, and follow-up regarding hypertension.  (Tr. 237).  He complained of chronic lower back pain at a level of 8/10, and the review of systems showed muscle pain and joint

stiffness.  (Tr. 237-38).  Musculoskeletal examination showed lumbosacral abnormalities and spasms, but straight-leg raising tests were negative.  (Tr. 239).  Plaintiff's functional status was again noted to be "No physical disability."  (Tr. 238).  Plaintiff also reported fatigue, decreased ability to concentrate, feelings of hopelessness/worthlessness, and hypersomnia.  (Tr. 237). However, his psychiatric examination showed a euthymic mood, a normal affect, and no recurrent suicidal ideation.  (Tr. 239).  Dr. Wilkins assessed hypertension, hyperlipidemia, backache, and depression.  Dr. Wilkins continued Plaintiff's medications and recommended consultation with a psychiatrist and mental health counselor.  Dr. Wilkins prescribed Lipitor and Paxil.  Dr. Wilkins ordered an orthopedics evaluation for lower back pain and an endocrinology appointment regarding Plaintiff's adrenalectomy.  (Tr. 240).

On October 6, 2010, an X-ray of Plaintiff's shoulder showed minimal to moderate degenerative joint disease of the shoulder.  (Tr. 316).  Also on October 6, 2010, Plaintiff visited Dr. David Kieffer for follow up regarding lower back and shoulder pain.  The review of musculoskeletal systems revealed tenderness on palpation of the acomioclavicular joint, acromion, subacromial bursa, and the anterior aspect of the acromion.  There were no abnormalities of the lumbar/lumbosacral spine.  (Tr. 276).  Dr. Kieffer assessed Plaintiff with a complete tear of the rotator cuff tendon, lumbago, spondylosis, lumbarspondylosis, and spondylosis without myelopathy.  Dr. Kieffer planned for Plaintiff to receive an MRI and X-ray. (Tr. 277).

### C.  OPINION EVIDENCE

On December 11, 2009, A Physical Residual Functional Capacity Assessment (PRFCA) was performed by Matt Peterson, a single decision maker.  (Tr. 224-29).  Mr. Peterson found that Plaintiff could occasionally lift and/or carry up to twenty pounds; could frequently lift and/or

carry up to ten pounds; could stand and/or walk, with normal breaks, for a total of about six hours in an eight-hour workday; could sit, with normal breaks, for a total of about six hours in an eight-hour workday; and could push and/or pull, including operation of hand/foot controls, an unlimited amount.  (Tr. 225).  Mr. Peterson further found that Plaintiff could frequently climb ramps/stairs, but only occasionally climb ladders/ropes/scaffolds; could frequently balance; and could occasionally stoop, kneel, crouch, or crawl.  (Tr. 226).  He found no manipulative, visual, communicative, or environmental limitations.  (Tr. 226-27).

### D.  VOCATIONAL EVIDENCE

A vocational expert (VE), Brenda Young, testified at the hearing before the ALJ.  (Tr. 41).  The VE stated that Plaintiff had worked in the past as an iron worker, *Dictionary of Occupational Titles (DOT)* code #801.361-014, and a substitute teacher, *DOT* code #092.227-010.  (Tr. 42).  The VE testified that the skills from the iron work would only transfer to other heavy or very heavy occupations.  (Tr. 43).  The VE testified that Plaintiff's past work as a substitute teacher was light and skilled.  (Tr. 42).  The VE clarified that the skills from substitute teaching, such as providing instruction, keeping records, and filing lesson plans, could be utilized in other jobs within the same industry, but not in other jobs at the sedentary level with the same level of vocational preparation.  (Tr. 43).

The VE testified that a hypothetical individual of Plaintiff's age and experience, who could perform at the light exertional capacity but could only lift, carry, push, or pull ten pounds frequently, and who required a sit/stand option to reposition themselves every hour without leaving the workstation, could perform Plaintiff's past work as a substitute teacher.  (Tr. 43).  The VE testified, however, that if such a person would need a ten-minute break every hour to lie

down, he would not be able to do Plaintiff's past work or any other work in the national economy.  (Tr. 43-44).

### III.     DECISION OF THE ALJ

On December 16, 2010, the ALJ issued an unfavorable decision.  (Tr. 9-22).  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 21, 2009, the alleged onset date.  At Step Two, the ALJ found that Plaintiff had severe impairments of degenerative disc disease and degenerative joint disease. Additionally, the ALJ concluded that Plaintiff's hypertension, hiatal hernia, and depression were not severe.  (Tr. 14).  At Step Three, the ALJ found that Plaintiff did not suffer from an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14-15).

Before Step Four, the ALJ found that Plaintiff retained the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that he was limited to lifting ten pounds frequently and requires a sit/stand option every hour without leaving the workstation. (Tr. 15).  At Step Four, the ALJ found, based on the testimony of a vocational expert, that Plaintiff was capable of performing his past relevant work as a substitute teacher.  (Tr. 19).

### IV.     GENERAL LEGAL PRINCIPLES

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a

conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).   In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d

12

605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to

other work, the claimant will be found disabled.  20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V.    DISCUSSION

The primary issues to be resolved are (A) whether the ALJ adequately analyzed Plaintiff's past work as a substitute teacher; (B) whether the ALJ erred by failing to analyze Plaintiff's depression using the special technique required by 20 C.F.R. §§ 404.1520a; and (C) whether the ALJ's RFC determination was based on substantial evidence.

### A.  The ALJ's Analysis of Plaintiff's Past Work As A Substitute Teacher

Plaintiff makes two challenges to the ALJ's analysis of Plaintiff's past work as a substitute teacher; the Court addresses each in turn.

#### 1.   Whether Plaintiff's work as a substitute teacher was "past relevant work"

Plaintiff argues that the ALJ's finding that his work as a substitute teacher constituted "past relevant work" was not supported by substantial evidence.

"Past relevant work is work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1); *see also Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009). Substantial gainful activity ("SGA") is work activity that is both substantial and gainful.  20 C.F.R. § 404.1572.  Work is "substantial" if it "involves doing significant physical or mental activities," and it is "gainful" if it is "the kind of work usually done for pay or profit, whether or

14

not a profit is realized."  20 C.F.R. § 404.1572(a),(b).  For claimants who are employees, the regulations contain guidelines for determining the average monthly earnings that will "ordinarily show that [a claimant] has engaged in substantial gainful activity"; that amount varies by year. 20 C.F.R. § 404.1574(b); http://www.ssa.gov/oact/COLA/sga.html.  Average monthly earnings below that amount "will ordinarily show" that a claimant has not engaged in SGA. 20 C.F.R. § 404.1574(b)(3).

Plaintiff argues that he did not perform his work as a substitute teacher at the level of substantial gainful activity.  He points out that the most he has earned in one year from substitute teaching was $7,413.67 in 2001, which averages out to $617.81 per month, and in most years he earned less than half that amount.  (Tr. 119).  Plaintiff argues that because the monthly SGA earnings level for 2001 was $740, Plaintiff's earnings fell below that level, and his substitute teaching work was not SGA.  Defendant counters that, as a substitute teacher, Plaintiff would only have worked during a standard nine-month school year.  Defendant therefore urges the Court to divide Plaintiff's $7,413.67 in yearly earnings by nine, rather than twelve, such that his monthly earnings were $823.74—an amount above the SGA level for 2001.

Defendant is correct that monthly earnings for SGA purposes are generally determined by averaging a claimant's earnings only over the months actually worked.  *See Anderson v. Heckler*, 726 F.2d 455, 456-58 (8th Cir. 1983); *Brown v. Astrue*, No. 4:07-CV-4039, 2008 WL 906642, at *3 (W.D. Ark. Apr. 2, 2008).  The problem with Defendant's argument, however, is that the record contains no evidence of how many months Plaintiff actually worked in 2001.  Although it is a likely possibility that Plaintiff worked only during the standard nine-month school year, it is also possible that he also worked during a summer session, or that the school district for which he worked had a school year that lasted for more than nine months.  The ALJ did not ask

15

Plaintiff how many months he worked in 2001, nor does the record otherwise indicate how many months he worked in 2001.  Thus, the Court does not find substantial evidence that would permit the ALJ's decision to be affirmed on that ground.

The Court notes that under some circumstances, a claimant's past work may be found to be SGA even if the claimant's earnings fell below the amount in the monthly earnings guidelines.  *See Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000) (affirming the ALJ's finding that a plaintiff's seasonal work constituted SGA despite low monthly earnings where the record indicated that the plaintiff had performed the work throughout the entire season every year, that the plaintiff had learned the job, and that the plaintiff's low earnings were more the result of choice than an indicator of a physical or mental inability to work to the entire year).  However, in this case, neither the ALJ nor the Defendant have provided any justification for finding Plaintiff's past work to be SGA despite his low earnings,[12] nor does the Court's review of the record reveal reasons for departing from the general rule.  The record in this case does not indicate whether Plaintiff's low earnings were due to his choice or some other reason.  *See Phillips v. Astrue*, 435 F. App'x 585, 588 (8th Cir. 2011) (citing *Reeder* but finding remand was required where the record did not reflect that the plaintiff's low earnings were a result of the plaintiff's choice).  In addition, in contrast to *Reeder*, the record in this case does not indicate that Plaintiff performed his work throughout the entire school year, year after year.  To the contrary, his earnings history from 2000 to 2009 shows that he has worked as a substitute teacher only sporadically: in most of those years, he earned only between $1,599 and $3,360 from

---

[12] It is unclear from the ALJ's decision whether the ALJ considered the issue of whether Plaintiff's past work as a substitute teacher constituted substantial gainful activity; she simply stated that Plaintiff was "capable of performing past relevant work as a substitute teacher."  (Tr. 19).

substitute teaching, and in two of those years, he earned less than $200 from substitute teaching. (Tr. 108-10).

In sum, the ALJ's finding that Plaintiff's substitute teaching was past relevant work was not supported by substantial evidence, and remand is warranted. *See Mueller*, 561 F.3d at 841 (remanding  where the ALJ found that the plaintiff could perform past relevant work without analyzing whether her past work rose to the level of substantial gainful activity);  *Gump v. Barnhart*, 334 F. Supp. 2d 1155, 1163 (E.D. Mo. 2004) (finding remand was necessary where the plaintiff's earning records did not demonstrate that the past jobs identified by the ALJ were performed at the substantial gainful level); *Marshall v. Barnhart*, 228 F. Supp. 2d 938, 946 (S.D. Iowa 2002) (finding that a plaintiff had not engaged in substantial gainful activity because her earnings had not exceeded the monthly SGA amount in the regulations).  On remand, the ALJ should further develop the record regarding Plaintiff's past work as a substitute teacher and should make findings regarding whether, and why, it constituted SGA.  If the ALJ finds that that Plaintiff's past work did constitute SGA, she should also assess whether the job lasted long enough for Plaintiff to have learned to do it. *See* 20 C.F.R. § 404.1565(a).

> 2. *Whether the ALJ adequately evaluated the demands of Plaintiff's past work as a substitute teacher*

Plaintiff also argues that the ALJ failed to make adequate findings regarding the demands of Plaintiff's past work as a substitute teacher.  At Step Four, one of the ALJ's tasks is to "'make explicit findings regarding the demands of the claimant's past work.'"  *Pfitzner v. Apfel*, 169 F.3d 566, 569 (8th Cir. 1999) (quoting *Groeper v. Sullivan*, 932 F.2d 1234, 1239 (8th Cir. 1991)).  The "ALJ may discharge this duty by referring to the specific job descriptions in the *Dictionary of Occupational Titles* that are associated with the claimant's past work." *Id.*; *see also Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013).

Here, the vocational expert, after reviewing Plaintiff's records and listening to Plaintiff's testimony, testified that Plaintiff's past work as a substitute teacher was light and skilled work, with a *DOT* number of 092.227-010.   (Tr. 42).   Although the ALJ's decision does not specifically mention *DOT* #092.227-010, the ALJ expressly relied on the vocational expert's testimony that Plaintiff's past work was as a substitute teacher and was light and skilled.  Thus, it is clear that the ALJ was referring to *DOT* #092.227-010, and that she satisfied her burden to articulate the demands of Plaintiff's past work.  *See Pfitzner*, 169 F.3d at 569; *Young*, 702 F.3d at 491.  The Court further notes that Plaintiff does not identify any demands of his past work that are not included in the *DOT* title referenced by the VE.

## B. THE ALJ'S FAILURE TO EVALUATE PLAINTIFF'S DEPRESSION USING THE "SPECIAL TECHNIQUE" REQUIRED BY 20 C.F.R. § 404.1520A

Plaintiff argues that the ALJ erred at Step Two of his analysis by determining that Plaintiff's depression was not a severe impairment without following the "special technique" required by 20 C.F.R. § 404.1520a for mental impairments.  Under the special technique, an ALJ evaluating the severity of a claimant's mental impairments is required to rate the degree of the claimant's functional limitation in four broad functional areas:  "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 404.1520a(a),(c)(3); *see also Buckner v. Astrue*, 646 F.3d 549, 556-57 (8th Cir. 2011).  The ALJ's decision "must include a specific finding as to the degree of limitation in each of the functional areas."  20 C.F.R. § 404.1520(e)(4).

It is undisputed that the ALJ did not follow the special technique in this case, as her decision does not contain specific findings as to the degree of limitation Plaintiff had in each of the functional areas.  However, Defendant suggests that the error was harmless, emphasizing that Plaintiff's mental examinations were normal, Plaintiff never sought treatment from a mental

health specialist, and Plaintiff did not allege depression as a basis for disability in his original application for benefits.

Based on the Court's review of the record, it appears likely that the ALJ's error was harmless.  However, given that this case must be remanded for other reasons, the Court need not engage in a harmless error analysis.  On remand, the ALJ should conduct an analysis of the severity of Plaintiff's mental impairments at Step Two that complies with 20 C.F.R. § 404.1520a, including making express findings as to Plaintiff's degree of limitation in each of the four functional areas.

### C.  THE ALJ'S RFC DETERMINATION

Plaintiff also challenges the ALJ's RFC determination.  The Court notes that on remand, the ALJ's determination of Plaintiff's RFC may be affected by the analysis she conducts at Step Two of Plaintiff's mental impairments, and/or by any additional evidence that comes to light if the ALJ develops the record regarding the reasons why Plaintiff generally performed his past work as a substitute teacher at earnings levels below SGA guideline levels.  Thus, the Court makes no finding regarding whether the current RFC assessment is supported by substantial evidence.  However, to minimize the possibility of future appeals and remands, the Court briefly addresses Plaintiff's specific arguments regarding the ALJ's RFC assessment.

First, Plaintiff argues that the ALJ failed to specifically set forth Plaintiff's maximum capacity for sitting and standing.  The ALJ found that Plaintiff could "perform light work as defined in 20 C.F.R. § 404.1567(b) except that he is limited to lifting ten pounds frequently.  He also requires a sit/stand option every hour without leaving the workstation."  (Tr. 15).  The cited regulation does not discuss maximum sitting or standing requirements, nor does the ALJ's decision.  However, as Defendant points out, Social Security Ruling 83-10 states that "the full

range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." The Court agrees with Defendant that the ALJ's finding, in combination with the regulation and Social Security Ruling, likely indicates that the ALJ was "implicitly" stating that Plaintiff could stand or sit up to six hour a day, provided that he could reposition himself every hour without leaving the work station. However, on remand, the ALJ should clarify her findings regarding Plaintiff's maximum capacity for sitting and standing.

Plaintiff also argues that the ALJ's RFC assessment was unsupported by medical opinion evidence, citing *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000). In *Nevland*, the court held that remand for further development of the record was required where there was no medical evidence from a treating or examining physician addressing the plaintiff's ability to function in the workplace. *Id.* at 857-58. Although the record contained numerous treatment notes, the court stated that the ALJ "may not draw upon his own inferences from medical reports." *Id.*

The court notes that it appears that the current RFC assessment was supported by some medical opinion evidence from Plaintiff's treating physicians regarding his ability to function in the workplace. Specifically, Plaintiff's treating physician, Dr. Wilkins, repeatedly noted throughout the disability period that Plaintiff's "functional status" was "no physical disability." (Tr. 18, 183, 186, 238, 242, 246, 250). In addition, in January 2010, after Plaintiff underwent surgery, his discharge papers instructed him only "to avoid lifting greater than 10 pounds for two weeks." (Tr. 331). However, when the ALJ re-assesses Plaintiff's RFC on remand, the ALJ should ensure that she is not improperly drawing upon her own inferences from medical reports and that her RFC assessment is supported by some "medical evidence," as required by *Nevland* and other relevant Eighth Circuit case law.

## VI.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Court finds the ALJ's decision is not supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and this matter is **REMANDED** for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g)

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this <u>28th</u> day of <u>March</u>, 2013.